UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/1/14

-----------------------------------------------------------x

MARI CRUZ PELLOT, o/b/o D.G.,  :

                            Plaintiff,  :

          - against -  :

CAROLYN COLVIN, Acting Commissioner  :
of the Social Security Administration,

                       :

                   Defendant.

-----------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
WILLIAM H. PAULEY**

13cv1922-WHP-FM

**FRANK MAAS**, United States Magistrate Judge.

        Pro se plaintiff Mari Cruz Pellot ("Pellot") brings this action, pursuant to

Section 405(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of

a final decision of the Commissioner of the Social Security Administration

("Commissioner")[1] denying the application of her minor daughter, D.G., for

Supplemental Security Income ("SSI") benefits.[2]  The Commissioner has moved for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

(ECF No. 18).  For the reasons set forth below, the Commissioner's motion, which Pellot

has not opposed, should be granted.

---

     [1]      The complaint in this action named the "Commissioner of Social Security" as the
defendant.  (ECF No. 2).  Following the Commissioner's lead, I have modified the caption to
reflect the name of the current acting Commissioner.

     [2]      Pellot's form complaint did not redact D.G.'s name and substitute her initials as
required by Rule 5.2(a) of the Federal Rules of Civil Procedure.  I have done so, however,
throughout this Report and Recommendation.

I.    Background

    A.    Procedural History

On April 27, 2010, Pellot filed an application for SSI benefits on behalf of D.G. alleging that D.G. became disabled on October 1, 2009.  (Tr. 94-100, 102-11, 112, 116).[3]  The Commissioner initially denied the application on June 29, 2010.  (Id. at 33-38).  Pellot then requested a de novo hearing before an Administrative Law Judge ("ALJ"), which was held before ALJ Kenneth Scheer on June 29, 2011.  (See id. at 23-32, 40-42).  Pellot appeared at the hearing with D.G. and testified; Pellot's non-attorney representative, Victor Ferrero, also was present.  (Id. at 8, 23-32).  On July 8, 2011, ALJ Scheer issued a decision denying D.G.'s application for SSI benefits.  (Id. at 8-18).  That ruling became the final decision of the Commissioner on January 23, 2013, after the Appeals Council denied Pellot's request for review.  (Id. at 1-3).

    B.    Relevant Facts

        1.    Non-Medical Evidence

D.G. was born on September 16, 2008, making her nineteen months old at the time of the hearing.  (Id. at 27, 94, 104).  She lived with her mother, Pellot, and her older sister in an apartment in the Bronx.  (Id. at 26-27).  At the time of the administrative hearing, D.G. had recently begun to attend daycare.  (Id. at 30).

---

[3]    "Tr." refers to the certified copy of the administrative record filed by the Commissioner as part of the Answer.  (ECF No. 12).

At the time that Pellot filed D.G.'s application for benefits, she completed a Child Function Report in which she reported that D.G. had no problems hearing, talking, understanding, learning, or relating with others around her. (Id. at 105-09). Although she also indicated that D.G. "wore glasses or contact lenses," there is no indication that this caused her any difficulties. She also noted that D.G. had several minor physical limitations that would be expected of a two-year old child, such as an inability to walk up and down steps by herself. (Id.).

Pellot's primary concern regarding D.G.'s health related to D.G.'s asthma. (Id. at 27). Pellot testified at the hearing that she had taken D.G. to the emergency room two or three times in the preceding six months, but usually had to make monthly trips to the emergency room due to D.G.'s asthma complications. Although D.G. had been hospitalized for three or four days on two prior occasions, once in 2009 and once in 2010, she had not received overnight treatment in the previous six months. (Id. at 27-29). D.G. also had never been intubated during any of her hospital visits, having been treated with steroids or a breathing machine instead. (See id. at 28-29). According to Pellot's testimony, D.G.'s asthma attacks did not have any specific triggers, and often occurred when D.G. otherwise was perfectly healthy. (Id. at 29-30).

In addition to emergency room treatment, D.G. received regular outpatient asthma treatment from her primary care physician at Segundo Ruiz Belvis Diagnostic & Treatment Center. (Id. at 27). Pellot had a breathing machine at home that she used to

control D.G.'s asthma attacks, although Pellot testified that the machine did not help much.  (Id. at 28, 30).

    2.    <u>Medical Evidence</u>

On September 30, 2008, approximately two weeks after she was born, D.G was taken to the Lincoln Medical and Mental Health Center Emergency Department because she had a cough and nasal congestion for two days.  (Id. at 517-23).  The attending physician who examined D.G. noted that, despite her coughing, D.G.'s lungs were clear and she was not in respiratory distress.  The physician diagnosed D.G. with an acute upper respiratory infection, for which he prescribed saline nasal drops; D.G. was discharged later that day.  (Id. at 522-23).

D.G. appears to have remained relatively healthy for the next eight months. On June 9, 2009, however, D.G. was taken to the emergency room at Bronx-Lebanon Hospital because she had a fever, congestion, and coughing fits.  (Id. at 453-68). Following a physical examination, the attending physician diagnosed D.G. with a viral syndrome and gave her 120 milligrams of Tylenol to reduce her fever.  Physicians discharged D.G. later that day with a prescription for 80 milligrams of Tylenol.  (Id. at 462-65).

Four days later, Pellot returned to the emergency room with D.G.  Pellot informed the attending physician that D.G. had been coughing and vomiting, was experiencing difficulty breathing, and had a decreased appetite.  (Id. at 378-84).  The physician who examined D.G. observed coughing and congestion, but otherwise found no

4

sign of respiratory distress.  (Id. at 379, 381).  D.G. was diagnosed with an upper

respiratory infection and discharged with prescriptions for saline nasal drops and 80

milligrams of Tylenol.  (Id. at 379, 383-84).

       Approximately one month later, on July 17, 2009, D.G. returned to the

emergency room with a fever and a cough.  (Id. at 236-40).  The attending physician

recorded D.G.'s temperature as 104 degrees and observed that D.G. was wheezing and

breathing rapidly.  (Id. at 236-37).  D.G. was given three doses of Albuterol and

ipratropium (a decongestant), one dose of prednisone (an anti-inflammatory medication),

and an injection of cefuroxime (an antibiotic).  (Id. at 231, 271).  A chest x-ray taken that

day suggested possible bronchiolitis,[4] so physicians admitted D.G. to the pediatric unit for

further antibiotic treatment and cardiorespiratory monitoring.  (Id. at 217, 271-74).

Following further observation, physicians diagnosed D.G. with acute bronchiolitis and

pneumonia.  (Id. at 233-34).  D.G. experienced no additional complications during a four-

day hospital stay, and her condition gradually improved with treatment.  (Id. at 271).  By

July 21, D.G.'s respiratory distress had fully resolved, so physicians discharged her with a

prescription for Azithromycin, an antibiotic, and an Albuterol inhaler with an

aerochamber mask to be used as needed.  (Id. at 269-74).

       On July 24, 2009, Pellot took D.G. to see her pediatrician, Dr. Artemio

Camacho, M.D., for a post-hospitalization follow-up.  Dr. Camacho performed a full

---

    [4]     Bronchiolitis is a condition characterized by inflammation of the passageways by
which air passes travels from the nose or mouth to the lungs.  Stedman's Medical Dictionary
(27th ed. 2000) ("Stedman's").

physical examination and noted no abnormalities.  According to Dr. Camacho's records, D.G.'s bronchiolitis had begun to resolve.  (Id. at 154).

A few weeks later, on August 13, 2009, D.G.'s fever returned.  Pellot took D.G. to the Bronx-Lebanon emergency room, where physicians observed that she was breathing rapidly and was congested, but otherwise showed no sign of respiratory distress.  (Id. at 403-13).  The attending physician noted that D.G. had a history of asthma, but no other significant health issues.  (Id. at 403-04).  The physician directed Pellot to use Motrin to treat D.G.'s fever and to follow up with D.G.'s pediatrician within a few days.  The hospital discharged D.G. later that day.  (Id. at 406-07).

Dr. Camacho saw D.G. again on October 1, 2009.  (Id. at 150).  During that visit, Pellot reported that D.G. had been wheezing and coughing persistently throughout the night for the past two nights.  (Id.).  After performing a full examination, Dr. Camacho diagnosed D.G. with asthma (with an acute exacerbation) and recurrent otitis media (ROM).[5]  (Id.).

On October 14, 2009, D.G. returned to the Bronx-Lebanon emergency room.  (Id. at 359-66).  Pellot informed the attending physician that D.G. had been coughing and showing signs of congestion for a full week.  (Id. at 359).  The physician observed no signs of respiratory distress, and recorded normal physical findings.  (Id. at 359-61).  He diagnosed D.G. with an upper respiratory infection and discharged her

---

[5]     Otitis media is the clinical term for a middle ear infection.  Stedman's.

6

within the hour.  The physician further instructed Pellot to use saline drops to treat D.G.'s congestion.  (Id. at 359-63).

D.G. saw Dr. Camacho again on October 30 and November 23, 2009.  (Id. at 148-49).  During both visits, Pellot indicated that D.G. had a persistent cough that had lasted more than one day.  Dr. Camacho noted that although D.G. had asthma, it was "well-controlled."  (Id. at 149).

On December 18, 2009, Pellot once again brought D.G. to the Bronx-Lebanon emergency room because D.G. had a fever and had been coughing persistently for the last few days.  The attending physicians sent D.G. home with a prescription for Prednisone, but she returned on each of the following two days because her cough had not improved.  (Id. at 414, 428).  On December 20, 2009, emergency room physicians admitted D.G. to the pediatrics department for treatment.  (Id. at 428).  Upon speaking with Pellot, the attending physician learned that D.G. used an Albuterol inhaler once or twice per month, and generally did not experience difficulty breathing at night or with activity.  (Id. at 414).  The physician then conducted a complete physical examination, noting that D.G. exhibited some abnormal breathing sounds but that her air entry appeared "fair."  (Id. at 416).  D.G. later underwent a chest x-ray, which revealed no evidence of a pneumothorax or effusion in the lungs.  Blood testing, however, indicated the presence of the respiratory syncytial virus (RSV) antigen.[6]  (Id. at 416, 428).  D.G.'s

---

[6]     RSV is a virus that generally causes only minor respiratory infection in adults, but can cause severe bronchitis and pneumonia in children.  Stedman's.

physicians ultimately determined that her respiratory distress was the result of either bronchiolitis or asthma, with the latter diagnosis considered less likely.  Based on these diagnoses, physicians gave D.G. saline nasal drops and an Albuterol nebulizer, and continued to monitor her throughout the night.  (Id. at 428).

Progress notes from the following day indicate that D.G.'s fever improved overnight but that her lung sounds had worsened slightly.  (Id. at 420).  By the third day of her stay, however, D.G. had stopped wheezing, and had only mild congestion.  (Id. at 423).  Her breathing and lung sounds continued to improve throughout the day, so physicians eventually discharged her that night.  (Id. at 424-27).  The final discharge diagnosis was "acute asthma exacerbation [secondary] to [an] RSV viral infection," for which she was prescribed an Albuterol nebulizer, Prelone,[7] and nasal saline drops.  (Id. at 429).

Approximately one week later, on December 28, 2009, Pellot brought D.G. to Dr. Camacho's office for a follow-up visit.  (Id. at 146).  Dr. Camacho noted that D.G.'s asthma symptoms were improving, and that she had not needed to use her nebulizer for the last two days.  (Id.).  A few days later, after a second follow-up, Dr. Camacho reported that D.G.'s asthma symptoms had fully resolved.  (Id. at 145).  One month later, during a routine check-up on January 26, 2010, Dr. Camacho noted that D.G. had not experienced asthma symptoms over the last month.  (Id. at 144).

---

[7]     Prelone is an anti-inflammatory medication used to treat asthma.  See Prelone, RxList, http://www.rxlist.com/prelone-drug.htm (last visited June 18, 2014).  It typically is taken in syrup form.  Id.

D.G. visited Dr. Camacho twice in March 2010, both times presenting with a persistent cough.  (Id. at 142-43).  On April 5, 2010, Pellot took D.G. to the Bronx-Lebanon emergency room for asthma-related symptoms.  (See id. at 193).  A few days later, Dr. Camacho evaluated D.G. and found no evidence of abnormal breathing sounds or obstructed airway.  During that visit, Dr. Camacho once again reported that D.G.'s asthma was "well-controlled."  (Id. at 194).

D.G. returned to Dr. Camacho's office on May 27, 2010, presenting with a persistent cough and fever that had lasted two days.  Dr. Camacho performed a physical examination of D.G. and found that her lungs appeared normal.  Accordingly, he simply recommended that she continue her current asthma treatment regime, and take Motrin to reduce her fever.  (Id. at 191).

D.G. saw Dr. Camacho for a routine health check on June 9, 2010.  Dr. Camacho noted good air entry and normal lung sounds in both lungs.  He further recorded that D.G. had mild, intermittent, exercise-induced asthma.  (Id. at 186-89).  About a month later, however, Pellot brought D.G. back to Dr. Camacho's office with a fever, intermittent cough, and sore throat.  (Id. at 185).  Dr. Camacho noted some redness in D.G.'s pharynx,  but all other examination results were normal.  He sent D.G. home with Tylenol, and recommended that she return a few days later for a checkup.  (Id.).  On follow-up examination, Dr. Camacho noted normal examination results.  (Id. at 184).

On August 13, 2010, Pellot brought D.G. to the Bronx-Lebanon emergency room after she experienced a full-body seizure that lasted three minutes.  (Id. at 202-07).

9

Following the seizure, D.G.'s physical examination results appeared normal.  The
attending physician diagnosed D.G. with febrile convulsions and gave her Motrin to
reduce the fever.  (Id. at 204).

   D.G. returned to the Bronx-Lebanon emergency room on August 18, 2010,
because she had been coughing and sneezing and had a runny nose for the past two days.
(Id. at 283-89).  After performing a physical examination and observing normal breathing
sounds and air entry, the attending physician diagnosed D.G. with an upper respiratory
infection and discharged her with a prescription for Pulmicort, a corticosteroid nebulizer
solution used to help prevent asthma attacks.  (Id. at 287-89).

   On September 8, 2010, Pellot again took D.G. to the Bronx-Lebanon
emergency room with a fever, stating that D.G. had a temperature of 102.4 degrees that
morning.  (Id. at 197-201).  The physician on call noted that D.G.'s temperature was 99.5
degrees when she arrived, and that her respiration appeared normal.  (Id. at 198-200).
D.G. was diagnosed with an ear infection and discharged later that day.  (Id. at 201).

   On October 13, 2010, D.G. returned to the Bronx-Lebanon emergency room
because she had been wheezing and coughing and had a runny nose.  (Id. at 289-300).
Physicians reported mild respiratory distress and gave D.G. Albuterol and Atrovent, a
medication used to treat nasal congestion.  (Id. at 292-93).  Following treatment, D.G.'s
shortness of breath and wheezing resolved.  The attending physician diagnosed D.G. with
an acute upper respiratory infection and acute asthma exacerbation.  Upon discharge,

D.G. was given a prescription for Albuterol, Atrovent, and Prednisolone.[8]  (Id. at 298-300).  She was described as "breathing comfortably."  (Id. at 299).

       D.G. had her next routine health check with Dr. Camacho on October 26, 2010.  (Id. at 179-82).  He noted that D.G. was doing well and that her asthma was well-controlled.  (Id. at 180).  On November 21, however, D.G. was taken to the Bronx-Lebanon emergency room because she had been "coughing a lot" since the previous day.  (Id. at 301-09).  Despite her cough, D.G. showed no sign of respiratory distress and her lungs appeared and sounded normal.  (Id. at 301-04).  The physicians diagnosed her with another upper respiratory infection and with "moderate persistent" asthma that was "no[t] well-controlled."  (Id. at 308).  D.G. was prescribed Flovent, a medication used to treat asthma, and discharged later that day.  (Id.).

       On December 16, 2010, Pellot took D.G. back to Dr. Camacho, reporting that D.G. had been suffering from a cough and fever for the past two weeks.  Dr. Camacho's primary diagnosis was a middle ear infection.  Notwithstanding D.G.'s symptoms, Dr. Camacho reported that her asthma was well-controlled.  (Id. at 178).  Approximately one month later, on January 24, 2011, D.G. returned to the Bronx-Lebanon emergency room after injuring her hand, although Pellot also reported that she had a cough, a runny nose, and problems breathing.  (Id. at 315-20, 399).  Although they

---

     [8]     Prednisolone contains the same active ingredient as Prelone, but in tablet, rather than syrup, form.  See Prednisolone, RxList, http://www.rxlist.com/prednisolone-drug.htm (last visited June 18, 2014).

noted her history of asthma, the emergency room physicians found no signs of respiratory distress.  D.G. thus was discharged later that day.  (Id. at 318-19).

Pellot again took D.G. to the Bronx-Lebanon emergency room on February 27, 2011, because D.G. had a high fever and a cold.  (Id. at 321-31).  The triage nurse recorded a temperature of 104.1 degrees upon arrival.  (Id. at 321).  While awaiting treatment, D.G. experienced a seizure that lasted approximately 45 seconds.  (Id. at 326).  Pellot reported that D.G. also had one other seizure in the past.  (Id.).  After D.G. stopped seizing, the attending physician performed a physical examination.  Although the results of this examination were normal, a chest x-ray taken later that day revealed minimally increased markings on both of D.G.'s lungs.  (Id. at 326-28).  Based on the physicians' observations and the x-ray results, D.G. was diagnosed with bacterial pneumonia and febrile seizures.  Physicians discharged D.G. that day with a prescription for ibuprofen and amoxicillin, and instructed Pellot to take D.G. to Dr. Camacho's office for a follow-up examination.  (Id. at 328).

D.G. next visited the Bronx-Lebanon emergency room on March 22, 2011, presenting with a cough that had lasted two to three days.  (Id. at 331-40).  The physician on call noted that D.G. was experiencing difficulty breathing, suggestive of acute asthma exacerbation.  After speaking with Pellot, the attending physician noted that Pellot had not complied with D.G.'s asthma treatment regimen.  According to that physician, D.G.'s symptoms had been triggered by an upper respiratory infection, for which she was given Albulterol and ipratropium nebulization.  (Id. at 335-37).  After D.G.'s breathing

12

improved, she was discharged; Pellot was instructed to follow up with Dr. Camacho over the next few days.  (Id. at 337-40).

       3.     <u>State Agency Review</u>

On June 21, 2010, Dr. Radharani Mohanty, M.D., a state agency consultant, reviewed D.G.'s medical records in connection with her application for disability benefits.  (Id. at 170-75).  Focusing on D.G.'s asthma, Dr. Mohanty concluded that D.G. had a "severe" impairment, but that it did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1").  (Id. at 170).  Dr. Mohanty then went on to assess whether D.G.'s impairments functionally equaled one of the impairments listed in Appendix 1.  As part of that assessment, Dr. Mohanty determined that D.G. had a "less than marked" limitation in the functional domain of "health and physical well-being," and no limitation in any other domain.  (Id. at 172-73).  As support for this determination, Dr. Mohanty noted that although D.G. tended to have a chronic, intermittent cough and had been hospitalized on two occasions for bronchiolitis and pneumonia, her treating physician, Dr. Camacho, repeatedly indicated in his records that her asthma was "well-controlled."  (Id. at 173).  Since D.G. had no "marked" or "extreme" limitations, Dr. Mohanty concluded that D.G.'s impairment did not functionally equal any impairment listed in Appendix 1.  (Id.).

       4.     <u>The ALJ's Decision</u>

In a decision dated July 8, 2011, ALJ Scheer found that D.G. was not disabled within the meaning of the Act and therefore denied her application for SSI

benefits.  (Id. at 8-18).  In reaching that conclusion, the ALJ applied the three-step

analytical framework used to determine a child's eligibility for SSI benefits.  See 20

C.F.R. § 416.924.

   At the first step, the ALJ determined that D.G. was an "older infant" who

had not engaged in substantial gainful activity since the date she applied for SSI.  (Tr.

11).

   At the second step, the ALJ found that D.G.'s asthma qualified as a "severe

impairment" that caused more than minimal functional limitations.  (Id.).

   At the third step, the ALJ determined that D.G.'s asthma did not meet or

medically equal one of the impairments listed in Appendix 1.  (Id.).  In coming to this

conclusion, the ALJ specifically considered Listing 103.03, which requires a disability

claimant to show that she has needed intensive treatment for prolonged asthma-related

attacks at least once every two months or at least six times per year.  (Id.).  Although D.G.

had visited the emergency room on multiple occasions due to asthma complications, the

ALJ noted that she had required emergency treatment on only three of those occasions –

October 13, 2010, January 24, 2011, and March 22, 2011 – and had been admitted to the

hospital on only two occasions – once in July 2009 for pneumonia and an upper

respiratory infection, and once in December 2009 for acute asthma exacerbation due to a

viral infection.  Since D.G. had no documented history of sufficiently frequent asthma

attacks, ALJ Scheer determined that her condition did not meet the criteria for Listing

103.03.  (Id.).

The ALJ further determined that D.G. did not suffer from an impairment or combination of impairments that functionally equaled the criteria for any impairment listed in Appendix 1.  (Id. at 11-17).  In doing so, the ALJ considered whether D.G. had marked or severe limitations in any of the six "functional equivalence domains" outlined in the Social Security regulations at 20 C.F.R. § 416.926a.  The ALJ noted that he had evaluated the "whole child" and "all of the relevant evidence in the case record," as required by 20 C.F.R. §§ 416.924a(a) and 416.926a(b).  (Id. at 12).

The ALJ concluded that D.G. had no limitations in the first five domains, which relate to "acquiring and using information," "attending and completing tasks," "interacting and relating with others," "moving about and manipulating objects," and "caring for [one]self."  (Id. at 12-16).  With respect to the final domain, "health and physical well-being," the ALJ concluded that D.G.'s limitations were "less than marked." (Id. at 16-17).  Although he noted that D.G. had been diagnosed with and treated for asthma, and that she had been hospitalized or needed emergency room treatment on at least four occasions, the ALJ found, based on Dr. Camacho's records, that D.G.'s asthma was only "mild" and "intermittent," and was "well controlled" with medication. Accordingly, he determined that D.G.'s asthma caused neither "extreme" nor "marked" limitations in her health and well-being.  (Id. at 17).

Based on all of these considerations, the ALJ determined that D.G. did not have an impairment or combination of impairments that functionally equaled one of the

impairments listed in Appendix 1.  The ALJ thus concluded that D.G. was not disabled. (<u>Id.</u> at 17-18).

II.    <u>Legal Standards</u>

    A.    <u>Standard of Review</u>

        Under Rule 12(c) of the Federal Rules of Civil Procedure, judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  <u>See, e.g.</u>, <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639, 642 (2d Cir. 1988); <u>Carballo ex rel. Cortes v. Apfel</u>, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

        The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); <u>see</u> <u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

        A district court is not permitted to review the Commissioner's decision <u>de novo</u>.  <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (citing <u>Schaal v. Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998)); <u>Jones v. Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991).  Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal

standard and that his decision is supported by substantial evidence.  See Hickson v. Astrue, No. CV-09-2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011) (citing Schaal, 134 F.3d at 504).  When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position."  Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).  This means that the ALJ's factual findings may be set aside only if a reasonable factfinder would have had to conclude otherwise.  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012).

>    B.    Disability Determination for Children

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The regulations set forth a three-step evaluation process for determining whether a child is disabled.  20 C.F.R. § 416.924; see, e.g., Martinez v. Astrue, No. 07 Civ. 3156 (WHP) (GWG), 2008 WL 4178155, at *7 (S.D.N.Y. Sept. 8, 2008) (citing Pollard v. Halter, 377 F.3d 183, 189-90 (2d Cir. 2004)).  First, the ALJ must consider whether the child has engaged in work that constitutes "substantial gainful activity," which would automatically exclude her from benefits.  20 C.F.R. § 416.924(b).  Second, the ALJ must determine whether the child suffers from at least one "severe" medically determinable impairment that causes "more than minimal functional

limitations." Id. § 416.924(c).  Third, if the ALJ finds a "severe" impairment, he must

determine whether it is the medical or functional equivalent of an impairment listed in

Appendix 1.  Id. § 416.924(d).  To qualify as a listed impairment's functional equivalent,

the child's impairments must cause "extreme" limitation in one, or "marked" limitation in

two of six "domains" established by the regulations.  Id. § 416.926a(a).  These domains

relate to:  (1) acquiring and using information; (2) attending and completing tasks; (3)

interacting and relating with others; (4) moving about and manipulating objects; (5)

caring for yourself; and (6) health and physical well-being.  Id. § 416.926a(b)(1).  A

marked limitation is "more than moderate," but "less than extreme," and must "seriously"

interfere with a claimant's ability to independently initiate, sustain, or complete activities.

Id. § 416.926a(e)(2).  An extreme limitation must "very seriously" interfere with a

claimant's ability to initiate, sustain, or complete activities independently.  Id.

§ 416.926a(e)(3).  Although not necessarily indicative of a total loss of functioning, an

"extreme" rating is given to only the "worst limitations."  Id.

III.   Analysis

        Applying the three-step framework to this case, it is clear that the ALJ's

finding of no disability was supported by substantial evidence.

    A.   Step One

        The first step requires the ALJ to find that the child has not engaged in

"substantial gainful activity" since the date she filed for benefits.  Id. § 416.924(b).

Clearly, D.G., who was less than three years old at the time the ALJ issued his decision,

had not engaged in substantial gainful activity.  The ALJ thus properly proceeded to the next step of the analysis.  (Tr. 11).

B.    Step Two

The second step of the analysis requires the ALJ to determine whether the child suffers from a severe impairment.  20 C.F.R. § 416.924(c).  ALJ Scheer found, and the Commissioner does not dispute, that D.G.'s asthma constituted a "severe" impairment within the meaning of the regulations.  (Tr. 11).  The ALJ's conclusion in that regard finds substantial support in the record.  D.G.'s medical records show that she frequently experienced coughing fits and some difficulty breathing, and that Pellot had taken her to the emergency room and to her primary care physician on multiple occasions seeking treatment for these issues.  Indeed, D.G. received emergency medical treatment on five occasions, (id. at 217-74, 289-300, 315-20, 331-40, 414-52), and was hospitalized twice for several days, (id. at 217-74, 414-52).  Based on this evidence, the ALJ reasonably concluded that D.G.'s asthma caused more than minimal functional limitations, and therefore qualified as a "severe" impairment.

C.    Step Three

The third step requires the ALJ to determine whether the child has an impairment or combination of impairments that meets or medically equals one of the impairments listed in Appendix 1.  If the child does not have an impairment that meets or medically equals a listed impairment, the ALJ must further consider whether the child has

an impairment or combination of impairments that is the functional equivalent of a listed impairment.  20 C.F.R. § 416.924(d).

### 1.    Medical Equivalence

The ALJ correctly determined that D.G.'s respiratory condition did not meet or medically equal the criteria for asthma-related disorders listed in Section 103.03 of Appendix 1.  Section 103.03 requires a claimant to demonstrate that her asthma involved "attacks . . . in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year." Appendix 1 § 103.03B.  Under this listing, "[e]ach inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks."  Id. The regulations define asthma "attacks" as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting."  Id. § 3.00C.

The record demonstrates that D.G.'s asthma attacks were not sufficiently frequent to satisfy the criteria listed in Section 103.03B.  Although D.G. made frequent trips to the emergency room due to difficulties breathing, her symptoms usually did not require the type of "intensive treatment" that would be necessary for them to qualify as "attacks" within the meaning of the regulations.  As the ALJ noted, the record shows that D.G. received such intensive treatment on only five occasions:  in July and December

20

2009, October 2010, and January and March 2011.[9]  (Tr. 27; see id. at 217-74, 289-300, 315-20, 331-40, 414-52).  Accordingly, even though D.G.'s hospitalizations in July and December 2009 both required inpatient treatment for more than twenty-four hours and, therefore, qualify as two attacks each, there is no consecutive twelve-month period in which D.G. suffered from at least one attack every two months or six attacks in one year.  For this reason, D.G.'s asthma did not meet or medically equal the listing pertaining to asthma attacks.

Although the ALJ did not specifically discuss any other asthma-related listings under Section 103.03, the record substantially supports the conclusion that D.G. also did not satisfy those criteria.  To satisfy the criteria listed under Section 103.03A, D.G. would have had to show, through objective medical documentation, a significantly reduced ability to expire normal volumes of air when breathing.  Appendix 1 § 103.03A.  To meet the criteria listed under Section 103.03C, D.G. would either have needed to provide radiographic imaging tests showing evidence of pulmonary hyperinflation or peribronchial disease, or show that she required courses of corticosteroids more than five days per month, on average, for at least three months.  Id. § 103.03C.  Finally, to satisfy the criteria listed under Section 103.03D, D.G. would have needed to show significant

---

[9]     At the time she was admitted to the hospital in July 2009, D.G. had not yet been diagnosed with asthma.  Physicians during that visit instead diagnosed D.G. with pneumonia and an upper respiratory infection.  (Tr. 233-34).  Whether D.G.'s symptoms on this occasion actually were the result of undiagnosed asthma makes no difference.  Even if this episode were considered an asthma attack, D.G.'s attacks still would not have been sufficiently frequent to satisfy the requirements of Section 103.03B.

growth impairment resulting from her asthma.  Id. § 103.03D.  D.G.'s medical records did

not include any evidence to suggest that she met any of these criteria.  Accordingly, the

ALJ correctly determined that D.G.'s condition did not meet or medically equal any

impairment listed in Appendix 1.

### 2. Functional Equivalence

The ALJ next went on to consider whether D.G.'s symptoms qualified as

the functional equivalent of any impairment listed in Appendix 1.  As part of this

analysis, the ALJ considered each of the six domains of functioning listed in 20 C.F.R.

§ 416.92a.  ALJ Scheer found that D.G. did not have any limitations in the first five

domains.  (Tr. 12-16).  That conclusion finds substantial support in the record.  Indeed,

the record contains no evidence whatsoever to suggest that D.G. had any limitations in

her ability to acquire and use information, attend to and complete tasks, interact with and

relate to others, move about and manipulate objects, or care for herself.  D.G.'s treating

physicians consistently noted that D.G. showed age-appropriate development.  (See id. at

181, 188, 194, 232).  During the administrative hearing, Pellot testified that D.G. got

along fairly well with her older sister, and that she could speak and was toilet trained.  (Id.

at 27).  In addition, in the Child Function Report completed in connection with D.G.'s

disability application, Pellot indicated that D.G. had no difficulties hearing, talking,

understanding, learning, or relating with others around her.  (Id. at 105-07, 109).  All of

this evidence provides substantial support for the ALJ's conclusion that D.G. had no

limitations in the first five domains of functioning.

ALJ Scheer finally went on to consider the sixth domain of functioning, which relates to the child's health and physical well-being.  In assessing a child's health and well-being, the ALJ must consider the "cumulative physical effects of physical or mental impairments and their associated treatments" on the child's functioning. 20 C.F.R. § 416.926a(l).  Some examples of limitations in this domain include:  (a) generalized symptoms such as weakness, dizziness, agitation, or lethargy; (b) somatic complaints related to one's impairments (such as seizures or convulsive activity, headaches, incontinence, recurrent infections, or allergies); (c) physical limitations due to medical treatments; and (d) exacerbations from one impairment or a combination of impairments that interfere with physical functioning.  Id. at § 416.926a(*l*)(4).

The ALJ correctly found that, despite her history of asthma, D.G. exhibited less than marked limitations in this domain.  Although he acknowledged that D.G. had been treated for asthma, the ALJ noted that D.G.'s own physicians consistently had described her asthma as "mild," "intermittent," and "well controlled" by medication.  (Tr. 17).  That assessment is consistent with the opinion of Dr. Mahonty, who reviewed D.G.'s medical records and concluded that she had less than marked limitation in her health and physical well-being.  (Id. at 172-73).  It further is supported by the fact that, at the time of the administrative hearing, it had been more than eighteen months since D.G. last had required overnight hospitalization for asthma-related symptoms.  In light of this evidence, ALJ Scheer's findings concerning D.G.'s health and physical well-being clearly were supported by substantial evidence and not erroneous.  See Wimbish ex rel. Wimbish

v. Comm'r of Soc. Sec., No. 10 Civ. 8227 (WHP) (KNF), 2011 WL 4057593, at *6-7

(S.D.N.Y. Aug. 24, 2011) (affirming ALJ's determination that claimant had less than

marked limitations in health and physical well-being despite the need for emergency

asthma treatment on several occasions), report and rec. adopted, 2011 WL 4336685

(S.D.N.Y. Sept. 14, 2011); Burrell ex rel. Davis v. Astrue, No. 04 Civ. 9551 (RMB)

(GAY), 2011 WL 197218, at *11 (S.D.N.Y. Jan. 5, 2011) (affirming ALJ's determination

that claimant had less than marked limitations in health and physical well-being because

claimant's asthma could be controlled by medication and a breathing machine, and

claimant had not been admitted to the hospital for overnight treatment within the past

year), report and rec. adopted, 2011 WL 197220 (S.D.N.Y. Jan 20, 2011).

IV.   Conclusion

    For the foregoing reasons, the Commissioner's unopposed motion for

judgment on the pleadings, (ECF No. 18), should be granted.

VI.   Notice of Procedure for Filing of Objections to this Report and Recommendation

    The parties shall have fourteen days from service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered

to the chambers of the Honorable William H. Pauley and to the chambers of the

undersigned at the United States Courthouse, 500 Pearl Street, New York, New York

10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b).  Any requests for extension of time for filing objections must be directed to Judge

Pauley.  The failure to file these timely objections will result in a waiver of those

objections for purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

Dated:      New York, New York
            June 30, 2014

                                            _____
                                                    FRANK MAAS
                                            United States Magistrate Judge

Copies to:

Honorable William H. Pauley (via hand delivery)
United States District Judge

Counsel (via ECF)

Mari Cruz Pellot (via U.S. Mail)
1490 Boston Rd., #6M
Bronx, NY 10460